**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

**SCOTTIE RAY PEAKE,**

      **Plaintiff,**

**v.**                                                   **Case No.: 5:17-cv-01998**

**NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Irene C. Berger, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 15, 18, 19).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the pleadings be

**GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.   <u>Procedural History</u>

On June 9, 2011, Plaintiff Scottie Ray Peake ("Claimant") completed applications for DIB and SSI, alleging a disability onset date of April 15, 2011, (Tr. at 252, 259), due to "blood clots in heart, lungs, and right knee." (Tr. at 320). The Social Security Administration ("SSA") denied Claimant's applications initially and on reconsideration. (Tr. at 119, 126-131). Claimant filed a request for an administrative hearing, (Tr. at 136), which was held on May 29, 2013, before the Honorable Anne V. Sprague, Administrative Law Judge ("ALJ"). (Tr. at 36-65). By written decision dated August 7, 2013, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 100-109). On September 23, 2014, the Appeals Council remanded the case to the ALJ, instructing the ALJ to more thoroughly address Claimant's long-term anticoagulation therapy and its effect on Claimant's ability to work. (Tr. at 115-117).

Accordingly, on March 24, 2015, the ALJ conducted a second administrative hearing. (Tr. at 66-92). By written decision dated June 8, 2015, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 17-30). The ALJ's decision became the final decision of the Commissioner on February 1, 2017, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 11, 12). Claimant then filed a Brief in Support of Judgment on the Pleadings, (ECF No. 15); the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 18); and

Claimant submitted a reply memorandum. (ECF No. 19). Therefore, the matter is fully briefed and ready for disposition.

## II.    <u>Claimant's Background</u>

Claimant was 36 years old at the time of his applications for DIB and SSI, and 40 years old on the date of the ALJ's second decision. (Tr. at 17, 252, 259). He has a high school education and received additional training in carpentry and insurance sales. Claimant communicates in English. (Tr. at 320-21). He has prior work experience as a childcare worker, kitchen worker, landscape laborer, and insurance salesman. (Tr. at 73-77, 321).

## III.    <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is

whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2015. (Tr. at 19, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since April 15, 2011, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that

4

Claimant had the following severe impairments: "degenerative disc disease of the lumbar spine; degenerative disc disease of the knee and hip; history of deep vein thrombosis (DVT) and pulmonary embolism requiring long-term Coumadin therapy." (Tr. at 19-20, Finding No. 3). The ALJ found that other impairments, as alleged or reflected in the record, were either non-severe or not medically determinable. (*Id.*).

Under the third inquiry, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 20, Finding No. 4). Accordingly, the ALJ assessed Claimant's RFC, finding that he possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except the claimant can occasionally crawl and climb ladders, ropes, and scaffolds. He can frequently kneel, crouch, stoop, balance, or climb ramps or stairs. He can have frequent exposure to extreme heat, cold, and vibration.

(Tr. at 20-28, Finding No. 5). At the fourth step, the ALJ found that Claimant was capable of performing past relevant work as an insurance salesman, as this job did not require the performance of work-related activities precluded by the Claimant's RFC. (Tr. at 28-29, Finding No. 6). Despite having made this determination, the ALJ proceeded to step five of the sequential evaluation process. The ALJ considered that (1) Claimant was categorized as a younger individual aged 18-49 on the alleged disability onset date; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination. (*Id.* at 28). Given these factors and Claimant's RFC, with the assistance of a vocational expert, the ALJ concluded that Claimant could perform other jobs that existed in significant numbers in the national economy; including housekeeper, assembler, and sales attendant. (Tr. at 28-29, Finding No. 6). Accordingly, the ALJ found that Claimant was not disabled under

the Social Security Act. (Tr. at 29-30, Finding No. 7).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant raises four challenges to the Commissioner's decision. First, he claims that the ALJ underrated the severity of Claimant's longstanding problem with recurrent DVT. Claimant argues that the ALJ incorrectly interpreted the evidence to show that Claimant had less than one DVT episode per year; in actuality, he had three DVT episodes in 2015, alone. (ECF No. 15 at 4). Second, Claimant asserts that the ALJ erred by commenting on Claimant's use of narcotics, implying that he abused drugs, but then failing to consider the effect of Claimant's drug use on his ability to work. (*Id.* at 4-5). Third, Claimant contends that the ALJ erred when she found Claimant capable of performing past relevant work as an insurance salesman. (*Id.* at 5-6). Claimant points to testimony offered by the vocational expert in which she confirmed that Claimant could not work as an insurance salesman if he needed an aid or device to ambulate. (*Id.* at 5-7). Claimant indicates that he regularly uses a cane to walk and stand. Therefore, he is not capable of working as an insurance salesman. As additional support for this position, Claimant relies on case law in this District, which he believes clearly establishes that an individual is not capable of light exertional work if he requires an ambulatory aid. Claimant indicates that insurance sales is categorized as light exertional work; consequently, such a job position is not available to him. Finally, Claimant alleges that the ALJ improperly rejected the opinion of a treating physician, Dr. Richard Durham. Claimant contends that the ALJ disregarded the opinion on the basis that it was vague. Claimant argues that if the opinion was indeed vague, the ALJ should have "fleshed out" its meaning by contacting Dr. Durham and discussing the opinion before simply declining it in its entirety. (*Id.* at 7-8).

In her Brief in Support of the Commissioner's Decision, the Commissioner responds that the ALJ accurately described the history and status of Claimant's DVT episodes, noting that Claimant only experienced a DVT when he failed to take his medication as prescribed. (ECF No. 18 at 12-13). The Commissioner adds that the ALJ had no obligation to assess Claimant's use of narcotics in any greater detail than was done, because the ALJ did not find Claimant to have a drug addiction and did not find him to be disabled. The Commissioner explains that drug addiction played no direct role in the disability determination unless a claimant is first found disabled. Only then must the ALJ assess the impact of the drug addiction. (*Id.* at 13-14). With respect to the ALJ's step four finding, the Commissioner argues that the record is devoid of evidence that Claimant's cane was medically required; accordingly, the ALJ's determination that Claimant could perform light work was supported by substantial evidence. (*Id.* at 14-16). The Commissioner maintains that, in any event, the ALJ proceeded to step five and found other work that Claimant could perform. Finally, the Commissioner posits that the ALJ properly rejected Dr. Durham's opinion. In the Commissioner's view, the ALJ had no obligation to seek clarification from Dr. Durham, because the other evidence of record provided a sufficient basis on which the ALJ could make a disability determination.

## V.    <u>Relevant Evidence</u>

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The evidence most relevant to the issues in dispute has been summarized below.

### A. Treatment Records

Claimant provided treatment records from the Robert C. Byrd Clinic in Lewisburg, West Virginia covering the time frame of July 2005 through June 2007. (Tr. at 504-49).

These records discuss a work-related injury suffered by Claimant in July 2005; injuries in a November 2005 motor vehicle accident; and some minor slip and falls that occurred in 2006. Claimant generally complained about a herniated disc at L5, cervical and lumbar strain, and radiculopathy. He was treated with pain medications, manipulation, physical therapy, and traction. (*Id.*). In January 2007, Dr. David Essig-Beatty referred Claimant to Dr. John H. Schmidt, III, a neurosurgeon in Charleston, West Virginia, to evaluate Claimant's low back and right leg pain. (Tr. at 492-95). Claimant described his pain, provided a history of his injuries, and outlined his prior treatment. Dr. Schmidt diagnosed Claimant with lumbosacral strain and spondylosis. Dr. Schmidt not did believe surgery was indicated and instead recommended conservative treatment with physical therapy, heat, massage, and strengthening exercises. He suggested that Claimant consider a cortisone injection to speed his recovery.

In March 2007, Dr. Essig-Beatty referred Claimant to Dr. James Leipzig, a spinal surgeon in Salem, Virginia, for a second evaluation of Claimant's continued pain and disc herniation. (Tr. at 497-98). After examining Claimant, Dr. Leipzig diagnosed him with chronic back pain, significant litigation issues, and mild desiccation at L4-L5 and L5-S1. Dr. Leipzig found lumbar x-rays and an MRI to be essentially normal, documenting that Claimant complained of diffuse disability and back pain that required chronic narcotic therapy, although there was no evidence of structural injury. Dr. Leipzig believed Claimant could be considered for pain management or physical therapy.

Additional treatment records from the same time frame indicate that Claimant was seen in June 2007 by a neurologist, Dr. John Collins, who confirmed Claimant's degenerative disc disease and disc bulging. (Tr. at 551). Dr. Collins advised Claimant to continue taking Valium and Lodine XL and to schedule an epidural steroid injection.

The next treatment records in evidence are dated October 14, 2010 and reflect a visit Claimant made to Greenbrier Valley Medical Center ("GVMC"). (Tr. at 403-04). Claimant complained of a sudden onset of left flank pain that radiated to his groin. He rated the pain at 10 on a 10-point pain scale, stating that it was the worst pain he had ever experienced, and he could find no position that would lessen the pain. A CT scan of Claimant's abdomen and pelvis revealed a tiny bladder calculus. (Tr. at 386). Claimant was assessed with renal colic and ureterolithiasis. He was discharged home and provided an excuse to be off work for two days.

Claimant presented to GVMC on May 16, 2011 with complaints of right rib pain made worse with deep breathing. (Tr. at 395-97). Claimant reported he had left his prior employment at a restaurant and was scheduled to start a new job with a lawn care company. Claimant denied any numbness or weakness of his extremities. On examination, he had paraspinal tenderness at T9 through T12 level, with pain on palpation of ribs 9 and 10. A chest x-ray revealed acute infiltrate in the right middle lobe. (Tr. at 382). Claimant was diagnosed with suspected pneumonia, given a shot of Toradol, provided prescriptions for Erythromycin and Lortab, and discharged home.

He returned to GVMC one week later, on May 23, 2011 complaining of shortness of breath and bilateral rib pain. (Tr. at 389-91). A chest x-ray revealed increased markings in the right and left base consistent with bilateral pleural effusion, worse compared to the May 16 x-ray. (Tr. at 381). A CT scan of the chest showed bilateral pulmonary emboli, with a saddle embolism straddling the midline. (Tr. at 380). Claimant was diagnosed with acute respiratory failure and large pulmonary embolism with saddle embolus. He received Percocet, Levaquin, and Dilaudid. After the CT scan, Claimant was started on Heparin, placed on oxygen, and transferred to Charleston Area Medical Center ("CAMC"), for

further treatment. (Tr. at 390).

Once at CAMC, Claimant was admitted to the services of Dr. James Brown, a hospitalist. (Tr. at 360). Claimant complained of severe chest pain that worsened with lying on his back, deep breathing, and laughing. He admitted smoking one pack of cigarettes per day, but denied recreational drug use or heavy drinking. Dr. Brown diagnosed Claimant with a saddle pulmonary embolism, hypokalemia, anemia, and tobacco abuse. (Tr. at 361). Claimant was evaluated by Dr. Tamejiro Takubo, a pulmonologist, who agreed that Claimant had a saddle pulmonary embolism, but also felt he had suffered a pulmonary infarct. (Tr. at 363). A duplex study of Claimant's lower extremities confirmed the presence of a DVT in Claimant's right leg. (Tr. at 365). Nonetheless, Claimant was described as being "remarkably stable" throughout the hospitalization. (Tr. at 356). He was discharged from CAMC on May 31, 2011 in improved condition. (*Id*.). He was given prescriptions for an anti-coagulant, Coumadin, to be taken daily, and for Percocet, to be used every four hours as needed for severe pain.

On June 2, 2011, Claimant presented to Debra Sams, D.O., to establish primary care. (Tr. at 408-09). Claimant reported a history of DVT and pulmonary emboli. His review of systems was negative except for some musculoskeletal complaints. On examination, Dr. Sams heard rales on auscultation of the lungs. However, Claimant's cardiac examination was normal with no gallops, rubs, or clicks. His peripheral pulses were full to palpation with no varicosities, and his extremities were warm with no edema or bilateral tenderness. The remainder of the examination was unremarkable. Dr. Sams diagnosed Claimant with saddle pulmonary embolus.

A few days later, on June 6, Claimant presented to the emergency room at GVMC with complaints of chest pain and dyspnea. (Tr. at 387-88). Claimant stated that he took

10

his last Percocet that morning and did not have an appointment set with Dr. Sams for another two days. The emergency room physician documented Claimant's recent history of pulmonary embolism. Claimant's physical examination was unremarkable, and his level of anti-coagulation was therapeutic according to an INR blood test result. Claimant was diagnosed with atypical chest pain and history of pulmonary embolus. He requested pain medication and received Percocet tablets. Claimant returned to Dr. Sams the following day. (Tr. at 406-07). His examination was again unremarkable except that auscultation of the lungs revealed rales. Claimant was advised to follow a low Vitamin K Coumadin diet and was given a prescription for Percocet.

On June 19, 2011, Claimant underwent a CT angiogram of the chest at GVMC. (Tr. at 436). The test revealed small pulmonary emboli that were thought to be residual. The examining radiologist noted that the angiogram report differed from virtual radiology results; however, Claimant was on anticoagulants.

On July 14, 2011, Claimant underwent a pulmonary function study administered by Dr. Z. Shamma. (Tr. at 419-20). The spirometry results indicated the FVC was 4.35 or 71%, with no real change with a bronchodilator. FEV1 measured 3.53, or 72 %, with no change with bronchodilator. The FEV1/FVC ratio measured 81. Dr. Shamma opined that these results were consistent with mild restrictive lung disease that did not improve with the use of a bronchodilator.

Claimant returned to Dr. Sams on July 28 and August 24, 2011. (Tr. at 431-33). On July 28, Claimant complained of minor dyspnea and a sprained ankle, and he reported a prior lumbar spine injury and herniation. His physical examination was unremarkable, except for rales in the lungs on auscultation. Claimant requested Percocet for pain control. On August 24, Claimant needed blood work performed, but had no new complaints. (Tr.

11

at 431). Claimant reported that he was scheduled to see a provider at a pain clinic in September. In the meantime, he was alternating between 9 mgs and 10 mgs of Coumadin. Claimant was advised to continue alternating Coumadin doses and was provided with a prescription for Lortab.

Claimant presented to the Beckley Pain Clinic on September 15, 2011. (Tr. at 601-03). Claimant reported a history of blood clots in the lungs and legs and admitted to smoking one-half pack of cigarettes a day for the past fifteen years. Claimant's current medications included Diazepam, Warfarin, Oxycodone, and Lyrica. He described having back pain that was aching, sharp, miserable, and accompanied by numbness. Claimant rated his pain at 8-9 on a 10-point scale. The pain was made worse by moving and when seated, but was somewhat alleviated by putting a pillow between his legs. On October 12, 2011, Heather McKinney, RN, CFNP, advised that Claimant had blood clots in his lower extremities and an embolism. (Tr. at 600). He was told to continue Coumadin therapy.

Claimant returned to the Beckley Pain Clinic twice more in 2011: November 11, and December 13. (Tr. at 481-82, 598-99). At both visits, Claimant reported low back pain that radiated down his right leg. The pain was constant, alleviated with medication, and made worse with activity. Upon examination, Claimant had thirty percent decrease in range of motion of the lumbar spine.

On January 12 2012, Claimant returned to the Beckley Pain Clinic. (Tr. at 480, 597). He complained of low back pain with numbness, burning, tingling and swelling of his legs. The pain worsened with lifting or standing and was alleviated with the use of a pillow. When examined, Claimant walked unassisted, demonstrating an even, steady gait. His lumbar spine showed a decreased range of motion with flexion to forty-five degrees. He experienced pain with extension and had radiculopathy symptoms in the right lower

12

extremity. Lateral bending and rotation were limited due to increased pain and discomfort. Claimant was given a prescription for Oxycodone.

Claimant returned to Dr. Sams on January 18 and February 2, 2012. (Tr. at 621-24). On January 18, Claimant told Dr. Sams he wanted to stop Coumadin treatment after having taken the medication for eight weeks. Claimant had no complaints and his examination was negative. Dr. Sams advised Claimant to stop taking Coumadin and to take aspirin daily. On February 2, Claimant complained of a bad cold and cough, but had no other complaints. Claimant was assessed with upper respiratory infection, allergies, and sinusitis.

Claimant was seen at the Beckley Pain Clinic on February 14 and March 14, 2012. (Tr. at 478-79, 595-96). At both visits, Claimant walked unassisted, with an even, steady gait. On February 14, Claimant reported his pain medication worked well and made his pain "bearable." On March 14, Claimant had no new complaints. (Tr. at 478).

Claimant returned to Dr. Sams on March 16, 2012. (Tr. at 625). Dr. Sams noted that the Beckley Pain Clinic would no longer prescribe Valium for Claimant, so at this visit, Claimant requested a new prescription for Valium. Claimant presented with a normal mood and affect. The examination was unremarkable other than auscultation of the lungs revealed rales. Claimant was assessed with chronic anxiety, mood disorder, and muscle pain. He was provided a prescription for Valium.

Claimant returned to the Beckley Pain Clinic on April 11 and May 12, 2012. (Tr. at 476-77, 593-94). On April 11, Claimant reported that the number of oxycodone tablets he received was not providing sufficient pain relief, so the dosage was increased. On May 12, the doctor noted that Claimant walked with an antalgic gait. At both visits, Claimant continued to complain of lumbar pain radiating into his right leg.

13

On May 17, 2012, Claimant told Dr. Sams he had no new complaints but wanted to discuss his Coumadin dosage. (Tr. at 626). Claimant's mood and affect were normal. An examination revealed rales in the lungs, leg weakness, and neuropathic pain in the right leg. Claimant was given a prescription for an Albuterol inhaler and scheduled for nerve conductions studies of the lower extremities.

One month later, on June 7, Claimant was seen at the Beckley Pain Clinic with continued complaints of low back and right leg pain. (Tr. at 475, 592). However, on examination, Claimant displayed an even, steady gait and walked without assistance. Claimant was prescribed Oxycodone for pain control.

Claimant returned to the Beckley Pain Clinic on July 10, 2012, (Tr. at 474), and a few days later was seen by Dr. Sams. (Tr. at 628). Dr. Sams scheduled a venous ultrasound, advised Claimant to eat protein bars, avoid drinking soda, and elevate his legs. That same day, Claimant underwent the deep venous ultrasound at GVMC. (Tr. at 649). The results were normal. Claimant also underwent an ultrasound of the arterial systems of both legs, which was unremarkable. (Tr. at 650).

On August 10, 2012, Claimant was examined by Dr. Narciso Rodriguez at the Beckley Pain Clinic. (Tr. at 464-66, 581-83). Claimant complained of stabbing, shooting, dull, achy back and leg pain with numbness, burning, tingling sensations, and swelling. However, he noted improved functional ability, stating that he could do housework and yard work. As for employment, Claimant stated that he "tried." He reported that he was not taking Coumadin at this time. (Tr. at 464). Although his physical examination was negative, Claimant received a lumbar epidural steroidal injection. (Tr. at 473, 590).

On October 1, 2012, Claimant presented to the emergency room at GVMC, complaining of chest pain and shortness of breath. (Tr. at 630). Dr. Sams performed an

examination, noting that Claimant was in mild distress, but had no significant physical signs of illness or injury. A CT scan of the chest was performed and showed bilateral pulmonary embolism. Accordingly, Claimant was admitted to the hospital for treatment. (Tr. at 631). Claimant's Coumadin was restarted, and he received Lovenox and pain medications (Tr. at 605-08). A venous doppler duplex ultrasound revealed popliteal deep venous thrombosis on the left. (Tr. at 611-12). An echocardiogram was performed, which revealed normal heart function with minimal mitral and mild tricuspid regurgitation and pulmonary hypertension. (Tr. at 606, 652). Claimant was discharged on October 5, 2012 in stable condition, with compression stockings and a prescription for Lovenox. (Tr. at 605). Dr. Sams opined that Claimant would need to remain on Coumadin for life due to recurrent blood clots.

Claimant returned to Dr. Rodriguez at the pain clinic on October 8, 2012. (Tr. at 460-63, 577-80). He reported experiencing break-through pain, although he was currently taking Oxycodone. Claimant stated that he was not interested in "weaning off" narcotic medication at that time. On examination, Claimant had tenderness of the spine in the midline, paralumbar, parathoracic regions, and buttocks. His range of motion, extension, and rotation were mildly decreased, but flexion was normal. Deep tendon reflexes were also normal. Claimant's straight leg raise test, crossed straight leg raise test, and stork test were positive; however, his gait was normal, and he walked without an assistive device. Claimant was diagnosed with pain in the hips, knee, ankle, and foot; pain to multiple joint sites; low back pain; lumbar and thoracic radiculitis; muscle spasm; degenerative disc disease of the lumbar spine; degenerative joint disease; and osteoarthritis to the knee, hip and thigh. Claimant was advised to continue his medication; to exercise, stretch, and walk; to follow a healthy diet; and to stop smoking.

Two days later, on October 10, Claimant returned to Dr. Sams for follow-up and to refill his prescription of Valium. (Tr. at 632). He refused tobacco cessation information. Claimant was provided a prescription for Clindamycin to treat a tooth abscess and received a work release authorizing his return to work on October 13.

Claimant presented to the Beckley Pain Clinic on November 7, 2012. (Tr. at 457-59, 574-76). He complained of pain, rating it 7 on a 10-point scale. On examination, Claimant had some midline and paralumbar tenderness, but his range of motion, flexion, extension, lateral bending, and rotation were normal. His lower extremity deep tendon reflexes were normal and symmetric, and strength and sensation were intact. Claimant walked without difficulty and did not use an assistive device. On November 8, 2012, Claimant asked Dr. Sams for a work excuse. (Tr. at 634).

Claimant saw Dr. Sams on November 14, 2012 with complaints of fainting, vomiting, chest pain, and increased stress. (Tr. at 636). Claimant stated that he wanted some time off from work. His physical examination was unremarkable; however, Dr. Sams ordered some testing and placed Claimant off work for one month. That same day, Claimant went to GVMC for a venous doppler duplex ultrasound of the lower extremities. (Tr. at 610). The results were normal, with no evidence of deep venous thrombosis. The following week, Claimant returned for a CT angiogram of the thorax, which showed minor atelectasis, but no evidence of a pulmonary embolus. (Tr. at 609).

Claimant returned to the Beckley Pain Clinic on December 6, 2012. (Tr. at 454-56, 571-73). Claimant reported low back pain for the past year that was aggravated with walking. Nevertheless, he walked without difficulty and did not require an assistive device. At a follow-up visit on January 8, 2013, Claimant reported that he was able to take out the trash and do housework, but could not manage lawn care. (Tr. at 451-53, 568-70).

16

His pain was alleviated by rest and made worse when bending. Strength in all extremities measured 5/5. Claimant was advised to continue with his medications and to exercise.

Claimant saw Dr. Sams on January 25, 2013 complaining of feeling "shaky inside" with possible anxiety. (Tr. at 640).He also noted blood in his stool for the past two days. Claimant reported that he had decreased his Coumadin dose without asking his physician. When examined, Claimant appeared in no distress and had a normal mood and affect. Nevertheless, he was assessed with anxiety disorder, given a prescription for Desyrel, and provided with a work excuse.

Claimant returned to the Beckley Pain Clinic on February 7, 2013 with complaints of low back and right leg pain. (Tr. at 448-50, 565-67). He stated that medication reduced the pain, but bending over or moving exacerbated it. Claimant reported that he was walking for exercise and could household chores, but not yard work. Claimant was advised to continue his medication regimen and exercise.

That same day, Dr. Rajnikant Shah performed nerve conduction studies to investigate a presumptive diagnosis of lumbosacral plexopathy without motor deficit. (Tr. at 467-70, 584-87). The study showed moderate peripheral neural hypofunction at the right L2 femoral cutaneous nerve consistent with an acute lesion or lateral femoral cutaneous syndrome. The right L4 saphenous nerve and left S1 sural nerve levels showed mild peripheral neural hypofunction that indicated lesions or entrapments acute in nature.

At the Beckley Pain Clinic on March 7, 2013, Claimant reported continued pain and numbness. (Tr. at 444-47, 561-64). His examination revealed tenderness to the midline and paralumbar spine, with normal range of motion, lateral bending, flexion, and extension normal. His lower deep tendon reflexes were normal and symmetrical, and his

strength and sensation were intact.

Claimant presented to Dr. Sams on March 15, 2013 for the purpose of a disability physical. (Tr. at 642-43). Claimant appeared very anxious, nervous, and easily upset. He reported having panic attacks. His physical examination was unremarkable. Dr. Sams diagnosed Claimant with panic attacks, stress disorder, and history of pulmonary embolism. Claimant was given a prescription for Prozac.

Claimant returned to Dr. Rodriguez at the pain clinic on April 11, 2013, complaining of pain made worse by bending or lifting. (Tr. at 440-43, 557-60). He described the pain as constant, but agreed that it was reduced with medication. Claimant stated that he walked for exercise. His musculoskeletal examination revealed normal symmetry, tone, strength, and range of motion with no effusions, instability or tenderness to palpation. Claimant's gait was normal, and the strength in his upper and lower extremities measured 5/5. Claimant was advised to continue his medications and exercise.

On October 28, 2013, Claimant was admitted to GVMC by Dr. Sams due to pulmonary emboli. (Tr. at 697-709). Dr. Sams noted that in April 2013, Claimant decided to stop taking Coumadin without physician approval and stopped coming to her office for follow-up. On this date, Claimant presented to the emergency room with acute right chest pain and shortness of breath. A CT angiogram of the chest showed a right lower lobe pulmonary embolism, so he was admitted to the intensive care unit. A CT scan of the thorax was performed and showed atelectasis and right lower lobe pulmonary infarct. An x-ray of the chest revealed patchy densities at the lung bases.  A venous doppler duplex ultrasound was completed and ruled out deep venous thrombosis. Claimant was discharged on November 5, 2013 with instructions to take Coumadin and Lovenox daily,

continue pain medications, continue the Coumadin diet, and attempt to get assistance with smoking cessation.

Claimant returned to GVMC's emergency room on June 3, 2014 with complaints of lung pain for the past three days. (Tr. at 688-92). Claimant reported taking Coumadin, but admitted that he had missed his weekend doses. He also admitted that he had not seen his primary care physician in months. Claimant stated that he had recently moved and thought the pain could be muscle strain. Claimant had mild chest and back pain on palpation. His range of motion was within normal limits, and his spinal alignment was normal. A straight leg raise test was negative, and deep tendon reflexes were normal. A CT angiogram of the chest revealed no evidence of a pulmonary embolism. Claimant was diagnosed with a history of pulmonary embolism and musculoskeletal pain. He was discharged in stable condition, but was instructed to resume taking Coumadin and to see his primary care physician.

Claimant was transported to GVMC via ambulance on February 27, 2015 after being involved in a motor vehicle accident. (Tr. at 670-78). Claimant was the restrained driver of a vehicle that rolled over after sliding on ice. He was not ejected from the vehicle and was able to walk at the scene of the accident. The emergency room physician documented that EMS staff administered Narcan to Claimant en route to the hospital, after they observed that Claimant had a decreased level of consciousness and pinpoint pupils. Claimant responded immediately upon receiving Narcan, but denied having used narcotics. Claimant complained of pain in the head, neck, and right knee. CT scans of the cervical spine and brain were normal, while a CT scan of the abdomen, chest, and pelvis showed degenerative disc disease, with no significant abnormality. X-rays of the knees demonstrated an absence of fractures. Claimant was assessed with multiple contusions

from a motor vehicle accident. He was released in stable condition, provided Tramadol and Flexeril, and advised to follow-up with his primary care doctor.

Claimant returned to GVMC on March 9, 2015 with complaints of chest pain in the posterior left upper chest and shortness of breath. (Tr. at 737-50). Laboratory studies revealed that Claimant's level of anti-coagulation was sub-therapeutic. A chest x-ray identified possible airspace disease, (Tr. at 731), and a CT angiogram of the chest showed a pulmonary embolism on the left with probable infarct. (Tr. at 734). Claimant was admitted and treated with Lovenox, Coumadin, and Dilaudid. He was discharged on March 14, 2015, with diagnoses of recurrent thromboembolic disease with a new left upper lobe pulmonary embolus; sub-therapeutic INR on presentation with possible pulmonary infarct; possible chronic thromboembolic pulmonary hypertension; moderate pulmonary hypertension; possible underlying chronic obstructive pulmonary disease secondary to tobacco use; and degenerative joint disease. Claimant declined an offer to transition from Coumadin to Xarelto for better management of his anti-coagulation. Accordingly, he  was advised to follow-up with the pulmonary clinic in two weeks.

On March 29, 2015, Claimant presented to GVMC with complaints of shortness of breath and pain with breathing that was further aggravated with deep breathing. (Tr. at 732-33). On examination, Claimant had decreased breath sounds and pleuritic chest pain. (Tr. at 759-60). He had no musculoskeletal abnormalities and a normal range of motion in the neck and back, without pain on palpation. A chest x-ray was normal. (Tr. at 758). Claimant was discharged, but returned the following day complaining of the same symptoms. (Tr. at 769-70). On examination, Claimant's breath sounds were normal and clear throughout, although he continued to have pleuritic chest pain. A DVT examination was performed and was negative. An ECG was also normal with no evidence of ischemia.

20

(Tr. at 771). Claimant was discharged in stable condition with diagnoses of chest pain and pulmonary embolism. (Tr. at 772).

On April 3, 2015, Claimant presented to LewisGale Alleghany Hospital with complaints of chest pain, back pain, and shortness of breath. (Tr. at 808-40). Claimant reported that he had been diagnosed with a pulmonary embolism two weeks earlier at GVMC, and since discharge, he continued to have left upper chest pain. He also reported falling on this date, twisting his back and right knee. Claimant indicated that the fall happened at a friend's house when his leg "gave out." Claimant was evaluated in the emergency department and then admitted to the service of Dr. Rajani Chilakapati. (Tr. at 834). Claimant provided his medical history to Dr. Chilakapati and reported that he was in pain despite having taken a Vicodin and having received Dilaudid in the emergency room. Dr. Chilakapati commented that Claimant asked for more pain medication, even though he had received Dilaudid only twenty minutes earlier. Claimant also mentioned receiving Ativan at the other hospital, but Dr. Chilakapati was unsure why Ativan was administered. Dr. Chilakapati documented his concerns about Claimant's possible drug-seeking behaviors. (Tr. at 834-35).

On examination, Claimant's heart had a regular rate and rhythm; his chest was atraumatic with no tenderness; breath sounds were normal. Claimant had normal extremities and no neurological deficits. A chest x-ray did not show any acute cardiopulmonary abnormality. (Tr. at 835). A CT scan showed a pulmonary embolism with a small-to-moderate clot burden bilaterally. The remainder of the results showed clear lungs, no pneumothorax, and no other abnormalities. (Tr. at 835, 873). An x-ray of Claimant's hips and pelvis was normal. (Tr. at 875). His laboratory results were also normal, except his level of anticoagulation was sub-therapeutic. Claimant was treated

with Lovenox and Coumadin. Claimant persistently asked for narcotic pain medication; refusing ice, heat, and Tylenol. However, he was not given any additional narcotics as Dr. Chilakapati observed Claimant and saw no objective signs of pain; such as, abnormal vital signs, evidence of pain on movement, or decreased appetite. (Tr. at 805). Claimant was discharged the following day with diagnoses of recent, acute pulmonary embolism; history of multiple pulmonary emboli in the past, on Coumadin, sub-therapeutic; status post tailbone pain from a fall; and chronic low back pain. Claimant was provided a prescription for Lovenox and advised to continue taking Coumadin until he reached a therapeutic level. Claimant's discharge medications included Lovenox, Coumadin, Gabapentin, and Omeprazole. (Tr. at 805).

Claimant returned to GVMC on April 5, 2015 for a CT angiography of the chest. The CT angiogram showed that the previously noted pulmonary embolism had resolved. (Tr. at 780). The imaging also reflected zones of apparent atelectasis with some scarring in the left upper lobe.

Less than two weeks later, Claimant again presented to GVMC after being struck in the face by another individual. (Tr. at 788-95). Claimant lost consciousness at the scene and was transported to the hospital by ambulance. Claimant denied chest pain and shortness of breath; his spine and extremities appeared without injury; he had a full range of motion; however, he slurred his speech. Drug/alcohol use was considered a possibility. A CT scan of the face revealed multiple facial fractures on the left and commuted fractures involving the left maxillary antrum, left orbit, left zygomatic body and arch, and pyterygoid places. Claimant had intracranial air, nasal fractures, and left mandibular fractures. (Tr. at 788-89). A CT scan of the brain likewise revealed intracranial air and multiple facial fractures. (Tr. at 790). Laboratory findings were positive for UR opiates,

benzodiazepine, methadone, and oxycodone. Claimant's anticoagulation was sub-therapeutic. He was diagnosed with head contusion, hematoma of head, and concussion with loss of consciousness. Claimant was transferred to CAMC for further treatment. (Tr. at 795).

### B. Evaluations and Opinions

On June 28, 2011, Dr. Sams completed a routine abstract physical form at the request of the Disability Determination Section. (Tr. at 412-16). She recorded that Claimant had normal vision, speech, gross motor ability, muscle bulk, reflexes, motor strength, coordination, and gait. However, he had a DVT in the right lower extremity, depression, bilateral pulmonary emboli, shortness of breath at rest, orthopnea, and edema of the right lower extremity. Based upon her findings, Dr. Sams diagnosed Claimant with right lower extremity DVT, bilateral pulmonary emboli, and abscessed tooth. She opined that Claimant was "completely disabled" for one year, but did not complete the section of the form entitled "medical source statement," which requested a function-by-function assessment of Claimant's ability to do work-related activities. (Tr. at 416).

On July 25, 2011, A. Rafael Gomez, M.D., completed a physical residual functional capacity assessment of Claimant. (Tr. at 421-28). He found that Claimant could occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand, walk and/or sit about six hours, each, in an eight-hour workday; and had unlimited ability to push and/or pull. Claimant could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; but could only occasionally climb ladders, ropes, and scaffolds, or crawl. Claimant had no manipulative, visual, or communicative limitations. Claimant had unlimited ability for exposure to extreme temperatures, wetness, humidity, noise,

vibrations or hazards like machinery or heights, but needed to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. As to symptom severity, Dr. Gomez found Claimant's allegations to be out of proportion to the medical findings and, therefore, not fully credible. He also opined that Claimant had recovered from his DVT and pulmonary embolism and was now on maintenance anti-coagulation. Dr. Gomez felt Claimant could perform work at the medium exertional level.

On November 10, 2011, Amy Wirts, M.D., reviewed the evidence in the file along with the physical residual functional capacity assessment performed by Dr. Gomez. (Tr. at 437). Dr. Wirts agreed with Dr. Gomez's findings as written. In addition, Dr. Wirts acknowledged reviewing Dr. Sams's June 28, 2011 opinion, finding Claimant disabled from work for one year, but noted that the opinion concerned an issue that was reserved for the Commissioner.

On December 18, 2014, Charles Plotz, M.D., completed a Medical Interrogatory Physical Impairment(s)—Adult form and a Medical Source Statement of Ability To Do Work-Related Activities (Physical) form. (Tr. at 658-66). Dr. Plotz did not examine Claimant, but found sufficient objective medical evidence in the record to allow him to form an opinion. Dr. Plotz found Claimant's impairments did not meet or equal any impairment described in the Listing. He supported this opinion by pointing out that Claimant had one episode of DVT and pulmonary embolism in May 2011. Claimant recovered from the event and was on a long-term Coumadin therapy. Although Claimant complained of neck and back pain resulting from a car accident, Dr. Plotz did not find any significant objective medical findings, noting that Claimant's musculoskeletal and neurological examinations were negative. Claimant had been prescribed hydrocodone for years and had "no interest in weaning off narcotics." (Tr. at 660). Dr. Plotz believed

Claimant's complaints of pain were very distinct from objective medical findings and opined that Claimant was capable of performing medium exertional level work. Dr. Plotz believed that Claimant could frequently lift and/or carry up to fifty pounds; could walk six hours in an eight-hour workday without interruption; could walk seven hours total in an eight-hour workday; and could sit and/or stand a total of eight hours in an eight-hour workday. Claimant did not need a cane to ambulate and had no manipulative limitations. He could frequently operate foot controls. Similarly, Claimant had no limitations on postural activities and no visual or hearing limitations. He could be exposed to unprotected heights; moving mechanical parts; humidity and wetness; dusts, odors and fumes; and could operate a motor vehicle continuously; however, Claimant could only frequently be exposed to pulmonary irritants and extreme temperatures. Dr. Plotz felt Claimant was able to shop; travel without a companion; walk without an assistive device; walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb a few steps at a reasonable pace with use of a single handrail; prepare simple meals; feed himself; take care of his personal hygiene; and sort, handle, or use paper files.

On April 13, 2o15, Dr. Richard Durham wrote a letter stating that Claimant had recurrent pulmonary emboli and COPD and was currently taking Warfarin therapy. Dr. Durham opined that Claimant could potentially develop a blood clot "at any time," while on Warfarin therapy, which could "potentially" cause a disability. (Tr. at 724).

### C. Claimant's Statements

In a Personal Pain Questionnaire, Claimant described having constant stabbing pain in his lungs, chest, stomach, and right leg. (Tr. at 306). He stated that movement made the pain worse, and medication relieved the pain to some extent. In an Adult

Function Report prepared on June 11, 2011, (Tr. at 311-18), Claimant also complained of shortness of breath and weakness. (Tr. at 311). He stated that all of his daily activities took longer because of shortness of breath. (Tr. at 312). Claimant did not do any household chores, but occasionally prepared his own meals. (Tr. at 313). His hobbies included writing, watching television, and sports, although he was unable to participate in sports due to his physical ailments. (Tr. at 315). Claimant spent time with family and friends and went to church as much as possible. He estimated that he could walk 25-30 feet before having to rest. (Tr. at 316). He was able to pay attention for "a long time," could follow instructions, and was able to handle stress. Claimant updated his Adult Function Report in August 2011. (Tr. at 339-46). He again complained of shortness of breath, pain, and weakness. Claimant stated that he did not sleep well and did very little around the house. (Tr. at 340-41). Claimant attributed most of his symptoms to DVT, but also mentioned that he had a low back injury that caused severe pain. (Tr. at 346).

Claimant testified at the first administrative hearing on May 29, 2013. He indicated that he stopped working in April 2011, because he was having trouble with back pain. (Tr. at 42). Claimant stated that he sold insurance, and the job required him to do a great deal of walking. Claimant received treatment for his back pain at the Beckley Pain Clinic and treatment for his DVT and associated pulmonary emboli from Dr. Sams. He testified that pain in his back and chest, and numbness in his right leg, were the greatest impediments to his ability to work. (Tr. at 47-48). Claimant stated that he could walk for about 45 minutes before getting short of breath and having to stop.

At the March 24, 2015 hearing, Claimant testified that he was continuing to receive Coumadin for anticoagulation and had to take the medication regularly to avoid an episode of DVT. (Tr. at 71). He stated that he worked at a restaurant the first quarter of

26

2014, but quit the job, because he could not keep up with the work. Claimant testified that his leg would become numb and would "give out" on him. (Tr. at 75). He described a recent fall he experienced while at the hospital, indicating that his leg went out from under him and he hit the floor. (Tr. at 79).

## VI.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.    <u>Discussion</u>

As stated, Claimant raises four challenges to the Commissioner's decision, which are addressed in turn.

### A.  ALJ's Assessment of Claimant's DVT

Claimant contends that the ALJ failed to recognize the severity of Claimant's DVT. Claimant's basis for this contention is the ALJ's description of Claimant's ongoing issues with DVT and pulmonary emboli as "occasional problems that generally occur when the claimant is noncompliant with his long-term Coumadin treatment." (Tr. at 26). The ALJ added that Claimant "had episodes in May 2011, October 2012, October 2013, and March 2015. This is less than once a year in frequency." (*Id.*). Claimant disputes this description of his condition, arguing that he had more frequent episodes than noted by the ALJ; particularly in 2015. Therefore, his DVT and related pulmonary emboli placed a much greater burden on his health than was acknowledged by the ALJ and substantially hindered his ability to work.

The undersigned finds no merit in Claimant's position. The ALJ thoroughly reviewed the medical evidence in her written decision and was aware of Claimant's recurring problem with DVT and associated pulmonary emboli. With respect to Claimant's embolism in 2015, the ALJ obviously considered Claimant's various hospitalizations in March and early April 2015 as one DVT episode. Such a description is not incorrect. According to the clinical records, Claimant was diagnosed with a pulmonary embolism that was not officially resolved until April 5, 2015, when a CT angiogram confirmed its absence.

Even so, the ALJ's discussion focused on more than simply the frequency with which Claimant experienced a DVT. The ALJ stressed the cause of the DVT episodes, emphasizing that Claimant developed blood clots when he was noncompliant with his Coumadin therapy and successfully avoided clots when he properly took his medication. In addition, the ALJ noted that during DVT episodes, Claimant's condition improved to

the point of full recovery when he received the necessary anticoagulation. Consequently, the ALJ properly determined that Claimant's DVT and pulmonary emboli were severe impairments, but were not disabling given Claimant's failure to comply with recommended treatment, which played a primary role in his development of DVT and pulmonary emboli. Certainly, in determining whether a claimant is disabled, the ALJ should consider the claimant's compliance with treatment prescribed by a medical source. *See* 20 C.F.R. §§ 404.1530, 416.930. ("In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work."). When a claimant fails to follow prescribed treatment without good reason, and this failure results in alleged disability, the claimant may not be entitled to benefits; benefits are not typically awarded when disability is self-created. *See Sizemore v. Berryhill,* 878 F.3d 72, 81 (4th Cir. 2017). Thus, taking the entire record into account, the undersigned **FINDS** that the ALJ did not err in her interpretation of the severity and functional impact of Claimant's DVT and pulmonary emboli.

### B.  ALJ's Assessment of Claimant's Drug-Seeking Behaviors

Claimant next asserts that the ALJ erred when she implied that Claimant had a drug addiction without making a finding that drug usage was a "contributing factor" to Claimant's condition. As the Commissioner aptly argues in response, the ALJ was not obligated to consider the impact of Claimant's narcotic use on his alleged disability for two reasons. First, the ALJ did not find Claimant to have a drug addiction, and second, the ALJ did not find Claimant disabled. *See Nipper v. Berryhill,* 7:16-CV-330-D, 2017 WL 6568761, at *2 (E.D.N.C. Dec. 4. 2017) (explaining that once a claimant is found disabled and there is medical evidence that the claimant has a drug addiction, the critical question is whether the claimant would still be disabled if he quit abusing drugs.); *also,* Social

29

Security Ruling ("SSR") 13-2P, 2013 WL 621536, at *10 (S.S.A. Feb. 20, 2013) (indicating that the SSA need not develop evidence of drug addiction "if the evidence we obtain about a claimant's other impairment(s) is complete and shows that the claimant is not disabled.").

As part of the credibility analysis, the ALJ discussed Dr. Chilakapati's note, which indicated that Claimant was exhibiting "drug-seeking behaviors." (Tr. at 27). The ALJ did not consider the note as evidence of drug addiction, a condition that was never diagnosed in Claimant's case. Instead, the ALJ surmised that this note provided an alternate explanation for Claimant's ongoing complaints of pain. Based on the evidence, the ALJ concluded that Claimant's complaints were disproportional to his relatively mild musculoskeletal findings. Consequently, drug-seeking behavior was a perfectly logical motivation—other than pain—for Claimant's extreme complaints. "An ALJ may consider evidence of drug-seeking behavior in evaluating a claimant's credibility." *Vest v. Colvin*, No. 5:13CV00067, 2014 WL 4656207, at *33 (W.D. Va. Sept. 16, 2014) (quoting *Similia v. Astrue,* 573 F.3d 503, 519 (7th Cir.2009); *Lewis v. Astrue,* 498 F.3d 909, 910 (9th Cir.2007)); *Elazzeh v. Astrue*, No. 4:10-CV-00016-D, 2011 WL 780521, at *8 (E.D.N.C. Feb. 10, 2011) (finding that drug-seeking behavior is relevant to the credibility inquiry). The ALJ addressed Claimant's narcotics use only in relation to his credibility. Nothing in the record suggests that Claimant had a diagnosed drug addiction, and he was not determined to be disabled. Therefore, his drug use was not considered in the context of how it contributed to a disability finding. Moreover, Claimant's failure to establish disability eliminated the need for the ALJ to further develop the evidence concerning Claimant's potential drug abuse.

Accordingly, the undersigned **FINDS** that the ALJ did not err in her treatment of

Claimant's alleged drug-seeking behaviors.

### C. ALJ's Finding that Claimant Could Perform Past Relevant Work

Claimant is critical of the ALJ's determination that Claimant could perform past relevant work as an insurance salesman. The crux of Claimant's argument is that he uses a cane to walk; therefore, he is unable to perform light exertional level work. Work as an insurance salesman is light exertional level work; as such, he cannot perform that job. Claimant does not address the Commissioner's counter arguments that Claimant has failed to establish the medical necessity of his cane and that, in any event, remand on this ground is futile, because the ALJ found other jobs that Claimant could perform regardless of his cane usage.

Examining first Claimant's need for an assistive device, the undersigned notes that the first time Claimant received a prescription for a cane was on March 14, 2015, a mere ten days before his second administrative hearing and nearly four years after the alleged onset of disability. (Tr. at 750). The cane was prescribed by Dr. Nathanial Kesner, one of Claimant's consulting physicians during a hospital stay at GVMC for a pulmonary embolism. The use of a cane was not recommended by Dr. Kesner. Instead, Dr. Kesner acquiesced to Claimant's request for a cane. (*Id.*). According to a clinical note, Claimant raised the issue of a cane during his discharge discussion with Dr. Kesner. In the course of the conversation, Claimant volunteered that he was working with a lawyer to obtain disability benefits and suggested to Dr. Kesner that he got around "a lot better" with a cane. Accordingly, Dr. Kesner wrote Claimant a discharge prescription for one. (*Id.*). Apparently, Claimant filled the prescription at some point thereafter, because his attorney raised the issue of the cane for the first time at the end of the second administrative hearing when questioning the vocational expert. However, Claimant did not testify about

31

the cane and did not submit any evidence at or before the hearing verifying his need for a cane.

The records submitted after the hearing included Dr. Kesner's note confirming that he wrote Claimant a prescription for a cane. Nevertheless, the prescription is not the end of the inquiry. Even when a cane is prescribed by a physician, it may not be accepted as "medically required" under Social Security regulations and rulings. *See Foster v. Colvin*, No. 2:14-CV-24973, 2015 WL 4944980, at *18 (S.D.W. Va. Aug. 19, 2015). According to the SSA, "[t]o find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking and standing, and describing the circumstances for which it is needed (i.e. whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96-9P, 1996 WL 374185, at *7 (S.S.A. Jul. 2, 1996).[1] "A prescription or the lack of a prescription for an assistive device is not necessarily dispositive of medical necessity." *Fletcher v. Colvin*, 2015 WL 4506699, at *8 (M.D.N.C. July 23, 2015) (citing *Staples v. Astrue,* 329 F. App'x 189, 191–92 (10th Cir. 2009)); *see, also, Crocker v. Colvin*, No. 1:15-CV-1215, 2016 WL 1626591, at *19 (E.D. Va. Apr. 21, 2016) ("Courts in the Fourth Circuit have held that even where a claimant is prescribed a cane, substantial evidence may support a conclusion that the cane is not medically

---

[1] While Social Security Ruling 96-9P concerns individuals capable of less than a full range of sedentary work, district courts within the Fourth Circuit consistently rely on the Ruling for guidance when a claimant alleges that a hand-held assistive device was not adequately considered in his or her disability determination. *See Schnurpel v. Berryhill*, No. 2:16-CV-06042, 2017 WL 2390548, at *13 (S.D.W. Va. Apr. 17, 2017), *report and recommendation adopted,* No. 2:16-CV-06042, 2017 WL 2389396 (S.D.W. Va. June 1, 2017);*Smith v. Colvin*, No. 4:15-CV-00175-RN, 2017 WL 27942, at *5 (E.D.N.C. Jan. 3, 2017); *Fletcher v. Colvin*, No. 1:14-CV-380, 2015 WL 4506699, at *8 (M.D.N.C. July 23, 2015); *Wimbush v. Astrue*, No. 4:10-CV-00036, 2011 WL 1743153, at *2–3 (W.D. Va. May 6, 2011); *Morgan v. Comm'r, Soc. Sec.*, CIV. No. JKB-13-2088, 2014 WL 1764922, at *1 (D. Md. Apr. 30, 2014); *Timmons v. Colvin*, No. 3:12CV609, 2013 WL 4775131, at *7–8 (W.D.N.C. Sept. 5, 2013); *Hamlin v. Colvin*, No. 8:12-CV-3601-RMG-JDA, 2014 WL 587464, at *13–14 (D.S.C. Jan. 23, 2014), *report and recommendation adopted*, No. 8:12-3601-RMG, 2014 WL 588073 (D.S.C. Feb. 14, 2014).

necessary, and as such, an ALJ's decision not to consider the impact of a claimant's cane use on her residual functional capacity is not error.") (collecting cases); *Morgan*, 2014 WL 1764922, at *1. The claimant bears the burden of presenting medical documentation that supports his need for an ambulatory aid. *Hamilton v. Colvin*, No. 3:15CV716 (REP), 2016 WL 4987329, at *7–8 (E.D. Va. Aug. 25, 2016), *report and recommendation adopted,* No. 3:15CV716, 2016 WL 4940329 (E.D. Va. Sept. 14, 2016). If the claimant fails "to supply appropriate documentation, the ALJ need not include the use of an assistive walking device in the RFC assessment." *Id. (*citing *Fletcher*, 2015 WL 4506699, at *8).

Here, the evidence supplied by Claimant clearly does not support a finding that Claimant's cane was medically required. Indeed, the evidence is so one-sided to the contrary that Claimant is hard-pressed to mount even a nominal argument in his favor. To begin, Dr. Kesner only prescribed the cane on Claimant's urging. Up to that point, the subject of a cane, or of any other ambulatory assistive device, simply does not appear in the record. The vast majority of the medical evidence confirms that Claimant walked and stood without assistance; never used, nor expressed a need for an ambulatory aid; had a steady and even gait; and walked for exercise. (Tr. at 413, 441, 449, 452, 455, 458, 462, 478, 479, 480, 558, 566, 569, 572, 575, 579, 595, 596, 597). The medical providers at the Beckley Pain Clinic, who were Claimant's primary treating professionals for his musculoskeletal complaints, never documented that Claimant required an ambulatory aid, nor did they prescribe such a device. Instead, they recommended that Claimant continue walking for exercise. Moreover, when Dr. Kesner wrote the note regarding Claimant's request for a cane, Dr. Kesner did not provide any reason for the prescription, other than Claimant's desire to have a cane. The records do not reflect an examination by Dr. Kesner to evaluate Claimant's need for an ambulatory assistive device, and Dr. Kesner

did not provide any details or instructions about when, where, and for how long Claimant might need to use the cane. Furthermore, none of the five medical opinions considered by the ALJ suggested that Claimant needed a cane. At least one medical source, Dr. Plotz, affirmatively opined that Claimant did not require an ambulatory assistive device. Indeed, even Claimant did not allege that he required the cane in order to walk or stand; Claimant never mentioned his need for a cane in the Adult Function Reports, or at either of the administrative hearings. Instead, the allegation that Claimant regularly used a cane was raised late in the second administrative hearing by Claimant's counsel and appeared out of thin air. At that time, no medical evidence had been supplied verifying a physician order for a cane, or documenting that Claimant needed assistance to stand or walk. Therefore, the undersigned **FINDS** that Claimant failed to satisfy his burden to establish that his cane was medically necessary, or that using his cane significantly interfered with his ability to do work-related activities.

Ancillary to the issue of whether Claimant medically requires a cane is Claimant's contention that he unable to do light exertional level work. At step four of the sequential evaluation process, the ALJ determined that Claimant could do light work with some postural and environmental limitations. Accordingly, the ALJ found that Claimant could do his prior relevant work as an insurance salesman. (Tr. at 28). Claimant argues that he cannot perform all of the job duties of that position, because it requires too much walking and standing. However, as the Commissioner emphasizes, the ALJ did not stop the disability analysis at step four. Instead, she proceeded to step five, asking the vocational expert to provide modified light and sedentary jobs that an individual with Claimant's physical and vocational characteristics could perform. The vocational expert provided some jobs at the modified light level and also opined that Claimant could work at

34

unskilled, sedentary, SVP 2 jobs; such as, assembler or weight tester, both of which existed in significant number in the regional and national economies. (Tr. at 89). On cross examination by Claimant's counsel, the vocational expert confirmed that Claimant could perform the sedentary jobs previously identified even if he relied upon a cane for standing and walking. (Tr. at 90). Accordingly, assuming *arguendo* that Claimant could establish the medical necessity of his cane usage, remand of this case would be inappropriate nonetheless, because the vocational expert explicitly found other jobs in the national economy that Claimant could perform despite the need for an ambulatory aid. *See Gardner v. Colvin*, No. 0:15-CV-01123-RBH, 2016 WL 4445375, at *5–6 (D.S.C. Aug. 24, 2016), *appeal dismissed sub nom. Gardner v. Comm'r of Soc. Sec.*, No. 16-2219, 2017 WL 4863160 (4th Cir. Feb. 16, 2017) (holding that "any error in failing to account for the use of the cane in the RFC assessment was rendered harmless by the ALJ's inclusion of the use of a cane in the hypothetical to the vocational expert and the vocational expert's response that at least 'three occupations she identified could be done with the use of a cane when walking.'"). In light of the vocational expert's testimony, any error at step four of the process was rendered harmless by the ALJ's step five analysis.

Therefore, the undersigned **FINDS** no error in either the step four or step five of the disability determination that would merit the remand of this case.

### D.  Weight Given to the Opinion of Dr. Durham

Lastly, Claimant argues that the ALJ erred by not fleshing out an opinion offered by his treating physician, Dr. Richard Durham. Claimant contends that the ALJ rejected the opinion as vague, but made no effort to contact Dr. Durham for an explanation of the opinion. The undersigned finds this challenge to be unavailing.

On April 13, 2015, Dr. Durham, who was Claimant's treating pulmonologist, wrote

the following letter:

> [Claimant] ... has a recurrent pulmonary emboli and COPD. He is currently on Warfarin therapy but could potentially develop a blood clot at any time while on Warfarin therapy that could potentially cause a disability. Patient has been on Warfarin therapy since 2011.

(Tr. at 724). The ALJ acknowledged the opinion, but recognized its weaknesses. (Tr. at 25). She noted that the opinion spoke only of a potential future medical event, failed to state the likelihood of the event occurring, and omitted any opinion of how long a resulting disability would last. The ALJ gave the opinion little weight due to its speculative nature. The ALJ observed that the letter said nothing about Claimant's current condition, adding that "it is quite telling that the claimant's own pulmonologist, when asked to provide a medical source statement, chose only to write that he may develop a disability, rather than stating that he had any current limitations." (*Id.*).

Contrary to the premise of Claimant's challenge, the ALJ did not reject the opinion because it was "vague." Rather, the ALJ gave the opinion little weight, because it provided no insight into Claimant's current condition. The letter spoke only of events that might, or might not, occur in the future. Given that Claimant's burden was to establish the existence of present disability, not the potential of a future one, the letter was properly rejected as irrelevant to the ALJ's analysis.

With respect to Claimant's contention that the ALJ should have fleshed out the opinion by contacting Dr. Durham, Social Security regulations do not place such an obligation on the ALJ. An ALJ has the option of obtaining additional medical evidence, including contacting medical sources, when the evidence before the ALJ is insufficient for purposes of determining if a claimant is disabled. 20 C.F.R. §§ 404.1520b(c); 416.920b(c) (holding that the ALJ *may* recontact a treating physician if the evidence is insufficient to

36

determine disability).[2] In other words, when the evidence in the record is adequate for a disability determination, the ALJ is not required to further develop the record. Claimant has failed to demonstrate how the record before the ALJ was insufficient and thus triggered a need for the ALJ to develop the evidence by recontacting Dr. Durham. *Coleman v. Colvin,* 1:15CV751, 2016 WL 5372817, at * (M.D.N.C. Sept. 26, 2016) (holding that when there is sufficient evidence in the record, the ALJ need not seek clarification from a medical source). The ALJ did not appear to be confused about the opinion, nor did she state that the opinion was inadequate. Instead, the ALJ found Dr. Durham's opinion to be probative largely for what it did not say. Dr. Durham did not list any functional limitations currently suffered by Claimant, did not express the opinion that Claimant was presently disabled, and did not estimate the likelihood that Claimant would experience a disabling event in the future. Further, Dr. Durham did not indicate that engaging in work-related activity would increase the risk of Claimant suffering pulmonary emboli. The ALJ reasonably concluded that the absence of these, or similar, opinions suggested that Claimant was not under a disability at the time the letter was written.

Accordingly, the undersigned **FINDS** that ALJ did not err by failing to recontact Dr. Durham. The record was sufficient for the ALJ to reach a disability determination. In addition, substantial evidence supported the ALJ's determination. The ALJ conducted a thorough review of the medical evidence, Claimant's statements, and the opinion evidence. The ALJ addressed and reconciled the medical source statements, explaining the reasons for the weight given to each opinion. Furthermore, the ALJ supported her assessment with references to the evidence. In light of the substantial medical

---

[2] These sections were amended in 2017; however, since the ALJ issued her opinion in June 2015, the version of the regulations in effect at that time are cited.

information and opinions, the record was more than adequate for the ALJ to reach a disability determination.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's Motion for Judgment on the Pleadings, (ECF No. 15); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 18); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if served by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party,

Judge Berger, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  February 8, 2018

Cheryl A. Eifert
United States Magistrate Judge